784 F.2d 98
 121 L.R.R.M. (BNA) 2809, 54 USLW 2451,
104 Lab.Cas. P 11,829
 Raymond J. DONOVAN, Secretary of Labor, Plaintiff,
and
Helen Carter, Plaintiff-Intervenor-Appellant, Cross-Appellee,
v.
CSEA LOCAL UNION 1000, AMERICAN FEDERATION OF STATE, COUNTY
AND MUNICIPAL EMPLOYEES, AFL-CIO,
Defendant-Appellee-Cross-Appellant.
 Nos. 485, 552, Dockets 85-6238, 85-6250.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 6, 1985.
Decided Feb. 14, 1986.
 
 Daniel E. Clifton, New York City (Clifton & Schwartz, New York City, of counsel), for plaintiff-intervenor-appellant-cross-appellee.
 Michael J. Smith, Albany, N.Y. (Roemer & Featherstonhaugh, P.C., Albany, N.Y., of counsel), for defendant-appellee-cross-appellant.
 Before LUMBARD, CARDAMONE and WINTER, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 This appeal presents the question of whether a plaintiff-intervenor who aids the Secretary of Labor in mounting a successful challenge to union election procedures under Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. Secs. 481-483 (1982), may recover attorney's fees from the defendant union.[1] We hold that attorney's fees may be granted to Title IV intervenors and affirm the district court's award in the present case; however, we believe that the district court should also have allowed fees for the time spent by intervenor's counsel on the fee application itself.
 
 
 2
 Because the events leading up to this petition for attorney's fees have been detailed in Donovan v. CSEA Local Union 1000, 594 F.Supp. 188 (S.D.N.Y.1984), aff'd in part and rev'd in part, 761 F.2d 870 (2d Cir.1985), we only briefly recapitulate. Intervenor Helen Carter is a member of the defendant union, the Civil Service Employees Association ("CSEA"), which represents approximately 200,000 employees of the State of New York and its various political subdivisions. Carter wanted to run in the union's 1982 election for the statewide office of Secretary. She failed to obtain the endorsement of a select "nominating committee" although the incumbent was automatically placed on the ballot in accordance with the union's constitution. Carter was also unable to get on the ballot through the alternative procedure of obtaining signatures from 2% of the union's membership--approximately 3,800 names based on 1982 membership--within 6 weeks of being rejected by the committee.
 
 
 3
 After protesting within the union the decision not to place her name on the ballot, Carter retained Daniel E. Clifton and filed suit against CSEA in the Eastern District of New York. She sought a preliminary injunction prohibiting the union from conducting the election. CSEA contested the court's jurisdiction, arguing that it was a public employee labor union and, therefore, not covered by the LMRDA or the Labor Management Relations Act. Carter's counsel was able to demonstrate, however, that CSEA represented a number of private-sector employees in industries affecting interstate commerce and that the federal labor laws were applicable. On May 13, 1982, Judge Sifton denied Carter's request for a preliminary injunction on the ground that Carter had failed to show a likelihood of success on the merits. This litigation was later dismissed as moot.
 
 
 4
 CSEA conducted a mail ballot election from May 15 to June 15, 1982. After the results were announced, Carter protested through union channels the nominating procedures and the lack of a secret ballot, but union officials refused to consider her protests, stating that they were untimely filed.
 
 
 5
 In August, 1982, Carter submitted an election complaint to the Secretary of Labor, pursuant to Sec. 402(a)(1) of the LMRDA, 29 U.S.C. Sec. 482(a)(1) (1982). Her counsel provided documentation to satisfy the Secretary that the CSEA was subject to the LMRDA. Counsel also provided the Secretary with material to show that Carter had exhausted her internal union remedies--a statutory prerequisite to the Secretary's exercising jurisdiction to investigate a union member's complaint. See id.
 
 
 6
 The Secretary then filed suit against CSEA in the Northern District on January 31, 1983. Carter subsequently intervened as a plaintiff. The Secretary sought a declaration that CSEA had violated Sec. 401(b) of the LMRDA, 29 U.S.C. Sec. 481(b) (1982), by failing to use secret ballots to conduct the election for statewide offices. The Secretary also alleged that CSEA's nominating procedures violated Sec. 401(e) of the LMRDA, 29 U.S.C. Sec. 481(e) (1982) by instituting an arbitrary committee selection process and unreasonable signature requirements for the nomination of certain candidates.
 
 
 7
 The Secretary moved for partial summary judgment on the secret ballot issue. CSEA cross-moved for summary judgment on the ground that Carter had not exhausted her internal union remedies. At the request of William M. Gonzalez, the attorney for the Department of Labor, Carter's counsel prepared papers in opposition to CSEA's cross-motion. On June 29, 1984, the court granted the Secretary's motion and denied the union's cross-motion. See 594 F.Supp. at 194-197.
 
 
 8
 Soon thereafter, the Secretary moved for partial summary judgment on the issue of CSEA's nominating procedures. The district court denied this motion stating that the use of the nominating committee standing alone violated the LMRDA, but that the signature procedure afforded candidates a reasonable opportunity to appear on the ballot. It concluded, however, in light of its decision on the secret ballot issue, that a rerun of the 1982 election would be required. See 594 F.Supp. at 188-194. A new election was held under the Secretary's supervision on October 15, 1984.[2] Carter appeared on the ballot but lost.
 
 
 9
 The Secretary appealed the denial of summary judgment on the issue of CSEA's nominating procedure. CSEA cross-appealed the district court's finding that Carter had exhausted her administrative remedies. Carter again intervened, filed a brief, and argued against the union's cross-appeal. On May 1, 1985, we affirmed the district court on the issue of exhaustion of remedies but reversed on the issue of nominating procedures. See 761 F.2d 870 (2d Cir.1985). We held that the signature method for getting on the ballot did not save CSEA's nominating procedures from attack because the signature requirement was not uniformly applied to all candidates, but rather imposed a significant burden on those not selected by the committee method.
 
 
 10
 After our decision, Carter petitioned the district court for costs and attorney's fees. Carter sought compensation her counsel's work in this lawsuit and in establishing that CSEA was governed by the LMRDA in the Eastern District litigation. Carter sought fees for 369 1/4 hours of attorney time at the rate of $100 per hour, plus costs of $861.20, for a total of $38,785.86. CSEA opposed the grant of fees arguing that there is no basis for such an award under Title IV and, in the alternative, that the amount sought was excessive.
 
 
 11
 The district court requested a statement from the Secretary on whether attorney's fees may be awarded to intervenors under Title IV and, if so, the appropriate amount to award to Carter. The Secretary declined to take a position on these issues and instead simply catalogued the assistance Carter's counsel had rendered. The Secretary explained that Carter's counsel had: (1) helped in ascertaining that CSEA was subject to federal jurisdiction under the LMRDA; (2) provided material showing that Carter had exhausted her internal union remedies; and (3) aided during the appeal of the nominating procedures issue by serving as a "ready reference" for information and by agreeing to limit his argument to dealing with CSEA's cross-appeal so that the Secretary could focus on the nominating procedure issue.
 
 
 12
 In a decision read from the bench, Judge Miner (then a district judge) held that attorney's fees are recoverable by an intervenor in a Title IV action, but that the amount Carter had requested was excessive. The court made no award for work performed by counsel during the unsuccessful Eastern District litigation, on the appeal of the instant case, or on the fee application itself. Judge Miner then disallowed half of the remaining hours submitted on the ground that they duplicated the Secretary's representation. Finally, the judge reduced the fee multiplier from $100 to $75, the prevailing rate in the Northern District for assisting, as opposed to lead, counsel. To this the judge added a small allowance for expenses and for the fees of local counsel bringing the total award to $7,112.10. The award was made in an order dated July 30, 1985.
 
 
 13
 Carter appeals that part of Judge Miner's decision in which he refused to award fees for counsel's work on the appeal or on the fee application itself. CSEA cross-appeals, seeking reversal of Judge Miner's determination that Title IV permits a fee award. CSEA argues, in the alternative, that Carter's counsel's work was so duplicative of the Secretary's efforts that the award should be even further reduced or affirmed.
 
 
 14
 It is true that Title IV does not explicitly authorize the award of attorney's fees to intervenors and the American Rule is that attorney's fees are not available to the prevailing party in federal litigation in the absence of statutory authorization. See Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 257-259, 95 S.Ct. 1612, 1621-1622, 44 L.Ed.2d 141 (1975). However, as the Alyeska court stated, "Congress has not repudiated the judicially fashioned exceptions to the general rule against allowing substantial attorneys' fees...." Id. at 260, 95 S.Ct. at 1623.
 
 
 15
 We hold that the award of attorney's fees to Title IV intervenors is permissible under the "common benefit" exception to the American Rule. This exception permits a court to compensate a successful plaintiff where his efforts have resulted in a substantial benefit to the members of an identifiable class of defendant beneficiaries. See Hall v. Cole, 412 U.S. 1, 5-7, 93 S.Ct. 1943, 1946-1947, 36 L.Ed.2d 702 (1973); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 393-94, 90 S.Ct. 616, 626, 24 L.Ed.2d 593 (1970).
 
 
 16
 In Hall, the Supreme Court held that attorney's fees may be awarded to individual union members who bring suit to enforce the "Bill of Rights" guarantees of Title I of the LMRDA. The court reasoned that a successful Title I plaintiff, though primarily seeking to vindicate his own interests, also benefits his fellow union members by promoting the free speech rights guaranteed by Title I. 412 U.S. at 8, 93 S.Ct. at 1947; see also Usery v. Local No. 639 International Brotherhood of Teamsters, 543 F.2d 369, 382-83 (D.C.Cir.1976), cert. denied, 429 U.S. 1123, 97 S.Ct. 1159, 51 L.Ed.2d 573 (1977) (citing "common benefit" awards in cases under Titles III and V of the LMRDA).
 
 
 17
 We believe that the logic of Hall and the LMRDA "common benefit" cases should be extended to allow attorney's fees to Title IV intervenors. We are mindful that the enforcement scheme of Title IV differs from that of the other LMRDA Titles. Although the other Titles rely on the private enforcement efforts of individual union members,[3] Title IV gives the Secretary of Labor exclusive authority to bring post-election challenge suits and permits the aggrieved election candidate to intervene solely to support the Secretary's complaint. See Trbovich v. United Mine Workers, 404 U.S. 528, 530-537, 92 S.Ct. 630, 632-636, 30 L.Ed.2d 686 (1972). We hold, nevertheless, that Title IV's requirement that the Secretary prosecute post-election challenge suits does not mean that courts may not recognize the contribution of individual union members and reimburse them for their expenses. As complainants and Trbovich intervenors, "[t]heir contribution may yield a substantial, and properly compensable, benefit to the membership exceeding that derived from the Secretary's efforts." Usery, supra, 543 F.2d at 383.
 
 
 18
 The first step in Title IV enforcement is for a union member to challenge the election through internal union procedures. The Secretary of Labor has no duty or authority to investigate a complaint until union procedures have been exhausted or have proven futile. If the Secretary finds probable cause to believe that a violation has occurred, he must bring an action to set aside the invalid election within 60 days of the filing of the union member's complaint. See LMRDA Sec. 402, 29 U.S.C. Sec. 482 (1982). The Secretary may seek to overturn an election only on grounds raised in "some discernible fashion" by the union member's protest to the union. Hodgson v. Local 6799, United Steelworkers, 403 U.S. 333, 340-41, 91 S.Ct. 1841, 1846, 29 L.Ed.2d 510 (1971); see also Wirtz v. Local 125, Laborers', 389 U.S. 477, 484, 88 S.Ct. 639, 642, 19 L.Ed.2d 716 (1968).
 
 
 19
 Thus, the use of enforcement procedures by the Secretary depends on the diligence of the individual union member. See Brennan v. United Steelworkers (District 15) (District 31), 554 F.2d 586, 595 (3d Cir.1977), cert. denied sub nom. United Steelworkers v. Sadlowski, 435 U.S. 977, 98 S.Ct. 1627, 56 L.Ed.2d 71 (1978) (White J., dissenting). The Secretary's authority to sue and any benefits that ultimately accrue to the union membership through the Secretary's prosecution derive from the initial efforts of the individual complainant.
 
 
 20
 Given the individual union member's pivotal role in Title IV enforcement, it is essential that the member be able to obtain competent counsel. The burden of investigating violations and pursuing them through union channels is an onerous one, and the individual union member may not be able to get the necessary assistance of counsel if attorney's fees are unavailable. Thus, the availability of attorney's fees is fundamental to the protection of union members' rights under Title IV.
 
 
 21
 We note that a contrary view has been expressed by Justice White. In a dissent from the Court's denial of certiorari in United Steelworkers v. Sadlowski, 435 U.S. 977, 977-980, 98 S.Ct. 1627, 1627-1630, 56 L.Ed.2d 71, he disputed the propriety of invoking the "common benefit" exception to the American Rule on behalf of intervenors in Title IV cases. He argued that because Trbovich limited the intervenor's role to pressing, in his own individual manner, the claims of illegality presented in the Secretary of Labor's complaint, it is the Secretary, not the intervenor, who provides the "common benefit" by championing the public interest in free and democratic union elections. Id.
 
 
 22
 This argument minimizes the importance of the intervenor's initial role in bringing possible Title IV violations to the Secretary's attention. Even if the intervenor provides little benefit at the trial stage compared to that provided by the Secretary,[4] the intervenor usually confers a substantial benefit on the union membership by identifying, investigating and presenting for the Secretary's ultimate prosecution, evidence of union violations of Title IV.
 
 
 23
 The case before us is instructive. Carter's counsel performed essential investigative work which later aided the Secretary on the jurisdictional question of whether the union was subject to the LMRDA. Counsel also guided Carter's protest through union channels, thereby laying the foundation for the Secretary's challenge to CSEA's nominating procedures and to CSEA's failure to use a secret ballot.
 
 
 24
 These contributions by Carter and her counsel redounded to the benefit of the entire CSEA membership. As the Hall decision notes, when the individual union member vindicates his rights under the LMRDA, the membership as a whole benefits from the promotion of union democracy. See Hall, supra, 412 U.S. at 8-9, 93 S.Ct. at 1947-1948. The individual's present victory creates a beneficial impact on the future conduct of the union's affairs.
 
 
 25
 As a direct result of the efforts of Carter and her counsel, it has been shown that CSEA is covered by the LMRDA, thus guaranteeing CSEA's members all the important protections of that Act. Carter's challenge was not to a single district election, but to a statewide election. Moreover, the benefits from this successful litigation are not limited to the supervised rerun of one isolated election, but will continue to be felt in future CSEA elections. As the whole membership of CSEA has shared in the fruits of Carter's labors, it is fair to charge the membership with some of the costs of these labors under the "common benefit" rationale. See Rollison, supra, 677 F.2d at 748; Brennan, supra, 544 F.2d at 604-07; Usery, supra, 543 F.2d at 383.
 
 
 26
 In urging that awards of counsel fees are not authorized, CSEA argues that Title IV of the LMRDA represents the type of explicit, comprehensive and exclusive remedial scheme that bars an intervenor's recovery of attorney's fees. See Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). In support, CSEA notes that other LMRDA Titles make specific provision for attorney's fees or other appropriate relief, while Title IV does not have a specific remedial provision.[5] CSEA also points out that Congress rejected a bill, H.R. 8342, 86th Cong., 1st Sess. Sec. 402(a) (1959), which would have provided for union member suits under Title IV, and would have authorized the award of attorney's fees.
 
 
 27
 We do not accept CSEA's statutory preclusion argument. Supreme Court decisions after Fleischmann have enunciated a presumption against statutory preclusion of courts' traditional power to grant attorney's fees in appropriate circumstances. See, Hall, supra; Mills, supra. In Hall, the court upheld a "common benefit" award of attorney's fees to a union member in his successful Title I action despite the fact that Title I provides only for "such relief (including injunctions) as may be appropriate," and does not, like Titles II and V, explicitly mention attorney's fees as a form of available relief.[6]
 
 
 28
 Mills and Hall express an unwillingness to infer Congressional intent to preclude awards of attorney's fees unless the statutory remedies have been " 'meticulously detailed' ", Hall, supra, 412 U.S. at 9, 93 S.Ct. at 1948, or there has been a " 'definitive and absolute setting of the Congressional face against the giving of such incidental relief by the courts where compatible with sound and established equitable principles,' " id. at 12, 93 S.Ct. at 1950. We cannot say that Title IV represents this type of comprehensive remedial scheme. As the many decisions interpreting Title IV's provisions suggest, the courts have had to flesh out the details of the Title IV enforcement scheme. See Usery, supra, 543 F.2d at 387.
 
 
 29
 Nor are we persuaded that the courts are precluded from awarding attorney's fees to intervenors because Congress rejected a private enforcement scheme and entrusted the Secretary of Labor with the primary responsibility for enforcing Title IV. The legislative history of Title IV reveals that Congress focused on the relative merits of public versus private enforcement--it did not consider the possibility of union members intervening in suits brought by the Secretary or the propriety of awards to successful intervenors. See Brennan, supra, 554 F.2d at 595; Usery, supra, 543 F.2d at 387. Moreover, as our discussion of the "common benefit" award of attorney's fees indicates, Congress created a significant role for the individual union member in Title IV's enforcement scheme. This supports our conclusion as "legislatures do not ordinarily create roles--strong roles--and then deny their existence by refusing to recognize the existence of the means to fulfill them effectively." Brennan, supra, 554 F.2d at 599.
 
 
 30
 Congress opted for the public enforcement scheme to protect unions from frivolous litigation by individual union members and to avoid multiple suits by allowing the Secretary to consolidate all meritorious complaints concerning a union election in a single proceeding. As the Trbovich court recognized in upholding union members' rights to intervene in suits brought by the Secretary, "There is no evidence that Congress was opposed to participation by union members in the litigation, so long as that participation did not interfere with the screening and centralizing functions of the Secretary." 404 U.S. at 532-33, 92 S.Ct. at 633. Similarly, we believe that Congress did not intend to interfere with the courts' equitable powers to award attorney's fees to Title IV intervenors if the award does not conflict with the above statutory goals.
 
 
 31
 Justice White has argued that such a conflict does arise if attorney's fees are assessable against a union on behalf of intervenors. He suggests that the adjudication of whether an intervenor has conferred a "common benefit" on his fellow union members would involve the "burdensome multiple litigation" Congress sought to avoid. See Sadlowski, supra, 435 U.S. at 978, 98 S.Ct. at 1628. We disagree.
 
 
 32
 We do not think that the court's resolution of what fees, if any, are appropriate in cases such as this amounts to "burdensome multiple litigation." "[T]he primary objection to the provision for member suits was that it might lead to multiple litigation in multiple forums, and thereby impose on the union the severe burden of mounting multiple defenses." Trbovich, supra, 404 U.S. at 534, 92 S.Ct. at 634. None of these evils are presented when an intervenor petitions the court for attorney's fees. The court and the parties are fully familiar with the contribution, if any, made by intervenor's counsel. Thus, the additional burden to the union in responding to the petition is minimal.
 
 
 33
 Finally, we reject the suggestion that awarding attorney's fees in Title IV cases will invite unnecessary intervention and create a disincentive to the Secretary's own rigorous enforcement of the statute. Although the Secretary has declined to take a position on the propriety of awarding attorney's fees, he has acknowledged that Carter's counsel did provide some valuable assistance. We think that the award of attorney's fees where intervenors have made a real contribution will enable intervenors to obtain the necessary legal assistance without threatening the Secretary's predominant role in the enforcement scheme. See Brennan, supra, 554 F.2d at 599; Usery, supra, 543 F.2d at 385 n. 45. Accordingly, we hold that an award of attorney's fees to Carter is consistent with Title IV of the LMRDA.
 
 
 34
 Judge Miner cut the requested allowance from $38,785.86 to $7,112.10. Those fees that were granted were predominantly for counsel's work done preliminary to, and not duplicative of, the Secretary's representation. The judge allowed fees for only a small fraction of counsel's time spent once the Secretary had taken over. We believe that such limitation encourages proper attention to the initiation of complaints without conflicting with the policy of limited intervention.
 
 
 35
 We agree with the district court's disposition of the application for fees, with the exception of the denial of fees for counsel's time spent on the fee application itself. The fee application is a necessary part of the award of attorney's fees. If the original award is warranted, we think that a reasonable amount should be granted for time spent in applying for the award.
 
 
 36
 Judge Miner, in denying this aspect of the request for fees, cited Colpo v. Teamsters Local 326, 531 F.Supp. 573 (D.Del.1982). There, the court relied upon "common fund" precedents to deny a Title IV intervenor's request for attorney's fees for work on the fee application itself. In "common fund" cases the attorney seeking fees has a conflict with his clients, who are to recover out of a fund secured in the litigation, because the award of "fees for fees" further depletes the common fund. The Colpo court confused "common benefit" with "common fund." In LMRDA "common benefit" cases, the benefit is the vindication of statutorily-conferred rights, not a fund that would be depleted by an award of attorney's fees. Thus, there is no conflict of interest between the attorney and his client that would preclude compensation for time spent in litigating the fee application. See Pawlak v. Greenawalt, 713 F.2d 972, 980-84 (3d Cir.1983), cert. denied, 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 172 (1984). We hold that Carter should be awarded an additional $1,537.50 (20.5 hours X $75) for her counsel's work, adequately recorded, in preparing the fee application itself.
 
 
 37
 Carter also appeals that aspect of Judge Miner's decision denying fees for counsel's work on the appeal of the nominating procedures issue. We agree with Judge Miner that counsel's efforts on the appeal duplicated the work of the Secretary; both the Secretary and Carter briefed the nominating procedures issue and responded to CSEA's cross-appeal regarding Carter's alleged failure to exhaust internal union remedies.
 
 
 38
 We do not view the work done by counsel in argument of the appeal to be sufficiently distinct from the Secretary's representation or beneficial to the union membership to warrant compensation for such work. Once a record has been made in the district court, the Secretary's need for additional assistance is minimal.
 
 
 39
 We affirm the decision of the district court granting Carter $7,112.10 in attorney's fees and add to that the sum of $1,537.50 for the fee application, a total of $8,649.60. The case is remanded for entry of an order in accordance with this opinion.
 
 WINTER, Circuit Judge, dissenting:
 
 40
 Because I agree with the views expressed by Justice White in his dissent from the denial of certiorari in United Steelworkers v. Sadlowski, 435 U.S. 977, 98 S.Ct. 1627, 56 L.Ed.2d 71 (1978), I respectfully dissent.
 
 
 
 [1]
 Other Courts of Appeals have held that such fees may be granted in Title IV cases. See Rollison v. Hotel, Motel, Restaurant and Construction Camp Employees, Local 879, 677 F.2d 741 (9th Cir.1982); Donovan v. Local 70 International Brotherhood of Teamsters, 661 F.2d 1199 (9th Cir.1981); Brennan v. United Steelworkers (District 15) (District 31), 554 F.2d 586 (3d Cir.1977), cert. denied sub nom. United Steelworkers v. Sadlowski, 435 U.S. 977, 98 S.Ct. 1627, 56 L.Ed.2d 71 (1978) (White J., dissenting); Usery v. Local 639 International Brotherhood of Teamsters, 543 F.2d 369 (D.C.Cir.1976), cert. denied, 429 U.S. 1123, 97 S.Ct. 1159, 51 L.Ed.2d 573 (1977). But see Marshall v. International Brotherhood of Teamsters, Local 20, 509 F.Supp. 926 (N.D.Ohio 1981)
 
 
 [2]
 Prior to the district court's decision, CSEA had agreed to discontinue its practice of automatically placing incumbents' names on the ballot. Moreover, in the rerun election, the Union required a member rejected by the committee to obtain only 1000 petition signatures, instead of the 2% figure of 3800, in order to have the member's name placed on the ballot
 
 
 [3]
 Title I, the Bill of Rights of union members, relies on private enforcement by union members and provides for "such relief (including injunctions) as may be appropriate," 29 U.S.C. Sec. 412 (1982). Title II, reporting provisions, also relies on private enforcement, but expressly provides for the discretionary award of attorney's fees, 29 U.S.C. Sec. 431(c) (1982). Title III, union trusteeships, provides for private enforcement, and, like Title I, approves the issuance of such relief as may be appropriate, 29 U.S.C. Sec. 464(a) (1982). Title V, fiduciary responsibility of union officers, permits union members to sue privately, and specifically indicates that attorney's fees are part of the "appropriate relief" recoverable, 29 U.S.C. Sec. 501(b) (1982)
 
 
 [4]
 Although the individual union member's contribution is most important during the period before the Secretary takes over, the individual's more limited role as an intervenor does not necessitate the conclusion, as a matter of law, that the member can render no further benefit once the Secretary has assumed control of the litigation. The intervenor may obtain information which might be difficult for the Secretary to find; and, a plaintiff-intervenor may offer significant contributions to the court's understanding of the case. See Brennan, supra, 554 F.2d at 595; Usery, supra, 543 F.2d at 384. See also Marshall v. United Steelworkers, 666 F.2d 845 (3d Cir.1981), cert. denied, 459 U.S. 823, 103 S.Ct. 52, 74 L.Ed.2d 58 (1982)
 The determination as to the extent to which the intervenor has provided a "common benefit" is best made by the district court.
 
 
 [5]
 See note 3, supra
 
 
 [6]
 The Hall court stated:
 Confronted with a virtually identical situation in Mills, we explained that the inclusion in certain sections of the Securities and Exchange Act of 1934 of express provisions for recovery of attorneys' fees "should not be read as denying to the courts the power to award counsel fees in suits under other sections of the Act when circumstances make such an award appropriate...."
 412 U.S. at 11, 93 S.Ct. at 1949 [citation omitted].